## HALL v. WEBB.

### Opinion delivered October 3, 1921.

1. TRUSTS—JURISDICTION OF EQUITY.—Courts of equity have full and
complete jurisdiction over trusts independently of statute,
whether the same arise by express declaration and agreement or
result by implication of law.

2. TRUSTS—INVESTMENT IN BANK STOCK—LIEN.—Where trust funds
have been wrongfully invested in bank stock, equity has author-
ity to declare a lien on the stock and to order a sale thereof.

3. CONSPIRACY—JOINT LIABILITY.— Where the complaint alleged
and the evidence established a conspiracy to defraud the ben-
eficiaries of a trust fund, it was not error to render a joint judg-
ment against the conspirators.

Appeal from Van Buren Chancery Court; Ben F.
McMahan, Chancellor; affirmed.

Appellants pro se.

1. The demurrer should have been sustained. The
complaint alleged wrongful possession. The statute, C.
& M. Dig. §§ 55-57 provides an adequate remedy at law.

15 Ark. 381; 134 *Id.* 484. The bill is essentially a bill of discovery which is not permitted by statute. C. & M. Dig. §§ 1037-1038; 49 Ark. 311. The question of title to the property was one for a jury, hence the court should have transferred the case to the circuit court, or held it for determination of title. 177 S. W. 1146; 156 Pac. 590; 80 Ore. 132; 158 Pac. 810; 74 Ark. 104.

2. The money in controversy having been delivered by the deceased in his lifetime to appellants, Hall, in conformity with his intention, as shown by the evidence, to leave what he had at the time of his death to those caring for him until that time, the title thereto at the time of his death was in said appellants, and not in his estate. 105 Ark. 116; 134 *Id.* 484.

3. The statute, C. & M. Dig. §6144, does not prohibit co-defendants from testifying as to conversations and transactions between the deceased and other parties defendant. 43 Ark. 307. The statement of deceased to Rutherford was competent, as was also a similar statement made by deceased in the letter. Greenleaf on Ev. §108; 12 Ark. 782; 43 Ark. 103. Letter was properly identified and made an exhibit without objection. Objection thereto for the first time after the deposition was read to the court, was insufficient. C. & M. Dig. §§4248-4249.

4. The evidence does not establish the allegation that delivery of the money was procured by fraud and deceit. Fraud will not be presumed. 108 Ark. 415. The burden of proving fraud was upon appellee.

*Garner Fraser, W. E. Hall* and *J. Allen Eades,* for appellee.

1. The demurrer was properly overruled. The complaint states a case clearly within chancery jurisdiction. 21 C. J. 50; *Id.* 110; *Id.* 116, 117; 70 Ark. 191; 101 *Id.* 455; 121 *Id.* 85; 74 *Id.* 121; 227 S. W. 2.

2. Considering the whole of appellants' testimony in connection with that of other witnesses, a court of

conscience could have rendered no other decree. The chancellor's findings on the evidence are at least persuasive. 95 Ark. 528.

3. Appellants were not competent witnesses as to transactions with and statements of the intestate. Their testimony as to these matters should not be considered. 79 Ark. 73, 74; 43 *Id.* 307.

HUMPHREYS, J. Appellee instituted suit against appellants and Cinda Hall, the wife of John Hall, in the Van Buren Chancery Court, to recover $3,300 alleged to have been received from Jasper Webb a short time before his death, for the purpose of distribution among his heirs after his death. In addition to alleging that the defendants, under a false claim of ownership, converted the money thus received to their own use, and that $1,000 of same was invested in bank stock, which they were about to sell to innocent purchasers, and that they were insolvent, and that appellee was without any adequate remedy at law, the bill contained the following allegation: "That the deceased was so weak in mind and body that he was incapacitated and unable to look after his business or financial interests and affairs; that he reposed absolute and explicit faith and confidence in the defendants; that the defendants, taking advantage of said faith and trust so reposed in them, and taking advantage of their relationship to the deceased, with the fraudulent intent, purpose and design to obtain possession of his property, overreached him and misled and deceived him, and falsely and fraudulently represented to him that, if he would turn over and deliver to them his money and other personal effects, they would care for same, and would correctly distribute same in the event of his death. That, relying upon said promises and representations so made to deceased by defendants, he delivered to them as trustees and fiduciaries for safe-keeping the sum of $3,300 to be by them taken care of for him." The prayer of the bill sought in substance to hold the defendants as trustees of the funds received and to enjoin a transfer of the stock and the expenditure of the fund.

To this bill, appellants and Cinda Hall filed a motion to transfer the cause to the circuit court, and a demurrer challenging the jurisdiction of the chancery court, and, without waiving their rights under the demurrer, answered, denying the material allegations of the bill and alleging that the moneys received were gifts to the appellants.

The cause was heard upon the pleadings and evidence adduced, which resulted in a decree overruling the demurrer and the motion to transfer to the circuit court and the dismissal of the bill against Cinda Hall for the want of equity, and in a finding that appellants received $1,450 belonging to the estate of Jasper Webb, deceased, out of which sum $874.41 had been invested in fifteen shares of bank stock in the Bank of Scotland, Arkansas, owned at the time of the rendition of the judgment by T. S. Hall, and that appellee should have a lien declared thereon for said amount. Judgment was rendered in accordance with the findings, from which an appeal has been duly prosecuted to this court, and the cause is here for trial *de novo.*

Jasper Webb, who had resided in California from young manhood until a few weeks before his death, informed John Hall, a nephew by marriage, by letter, that he had sold his farm, was in poor health and would like to spend his remaining days in Arkansas if he could come or send for him. He enclosed in the letter $500 for the Jeff Webb family, consisting of five persons, with directions that John Hall see that each received his respective share. This money was divided as directed. In response to John Hall's next letter, the following letter was written by Jasper Webb to him:

"Springville, Cal., Aug. 24, 1919.
"Mr. John Hall,
        "Scotland, Arkansas.

"Dear Nephew: Your letter to hand found me still improving some in health but slowly. I guess I shouldn't complain for a man 84 years old. I hope these few lines

will find you well. You said you was not able to make
the trip, but would send after me if I wanted to come and
live with you the rest of my days. I written you before
that I have sold my little farm and reserved a right to
live on it as long as I wanted to, but now if you will be
kind enough to come or send after me and take care of
me the rest of my days which I am sure are but few, you
shall have what little I have got. It is not much, but
enough to do us a while. So let me hear from you soon.

　　　　　　　"Your uncle,

　　　　　　　　　　　　"Jasper Webb."

T. S. Hall, a son of John Hall, went to California
soon after the receipt of the last letter to bring his great
uncle to Scotland, Arkansas, where John Hall resided
and conducted a hotel. One witness testified that T. S.
Hall told him that Jasper Webb sent him $100 to pay
his way to California. T. S. Hall denied that he made
the statement. John and T. S. Hall testified that T. S.
Hall took $400 of John Hall's money to California for
the purpose of paying the return expenses of Hall and
Webb if needed, and, if not needed, to convert it into
gold and bring it back. T. S. Hall testified that, after
reaching California, Jasper Webb made him a present
in all of about $450; that, when he started back, Jasper
Webb purchased a draft payable to himself for $1,000,
being all the money he had except expense money for the
return trip; that he, Hall, purchased a draft for $800,
payable to himself; that, in the purchase of the draft, he
used his own money and $400 that his father had given
him before he left for California; that the expense of the
return trip was borne largely by his uncle and partly by
himself; that, after his return, his uncle indorsed the
$1,000 draft and he placed it, together with the $800 draft,
to his personal credit in the Scotland bank and gave his
uncle $1,000 in cash, which he gave to his father, John
Hall, for taking care of him the rest of his life. John Hall
testified he gave him $40 at one time, $80 at another, and
the balance of the thousand at another, for agreeing to

take care of him the rest of his life; that he had expended practically all the money at the time he testified, and was unable to give any itemized account of the expenditures. Webb and Hall reached Scotland about September 19. Webb went at once to the hotel conducted by John and Cinda Hall, and, after a short illness, died on October 14, 1919. On October 27 thereafter, Dr. Hatchett transferred ten shares of the bank stock to T. S. Hall and five shares to John and Cinda Hall jointly; that the stock was paid for by a check in the sum of $1,175, drawn by T. S. Hall on his account; that in the latter part of the year 1919, John and Cinda Hall transferred the five shares of stock, which had been transferred to them jointly, to T. S. Hall. J. H. Lindsey testified that, on September 26, 1919, T. S. Hall deposited $1,970, of which the two California drafts represented $1,800; that, on October 27, 1919, the account had been reduced down to $874.40; that, on that day, Hall deposited $379, and the bank paid his check to Dr. Hatchett of $1,175 for the fifteen shares of stock. Also that T. S. Hall asked him whether he could deposit $1,500 in gold in the bank and receive it back in gold a short time after he returned from California. He was informed that he could.

R. W. Hall, an uncle of T. S. Hall, testified that, soon after returning from California, he told him his Uncle Jasper was feeble, and that when starting he forgot $750 in gold that was hidden in the stove-wood box and went back and got it.

Dr. Hatchett testified that John Hall came to him the evening he agreed to sell fifteen shares of stock in the bank to T. S. Hall for $1,175 and wanted to know what one-third of $1,175 was, without explaining why he wanted to know.

John Hall, Cinda Hall and T. S. Hall all testified that one-third, or five shares, of the stock was sold by T. S. Hall to his mother for cash, but none of them could explain why the five shares were transferred to John and

Cinda Hall jointly, or why later in the year it was transferred to T. S. Hall, except that Cinda Hall got tired of owning the stock.

T. S. Hall testified that he had paid a portion of the $1,800 out and borrowed $750 from Cleve Hall to aid in the purchase of the fifteen shares of bank stock, and also got $500 from his mother for the same purpose; that he did not put a cent of the old man's money in the stock.

Cleve Hall testified that he loaned his brother, T. S. Hall, $750 about that time and produced the note which was given to him.

W. O. Rutherford, a neighbor of Jasper Webb, Sr., for years in California, testified that he purchased his farm in 1919 for $1,750; that $500 of the money was sent to John Hall for the Webb heirs, and $1,000 was used to purchase the $1,000 draft which he took to Arkansas with him; that he believed Webb had about $800 at home in addition to that amount.

Jasper Webb, Jr., a nephew of Jasper Webb, Sr., and brother to Cinda Hall, testified that his uncle told him he had given his money to no one about a week before his death; that, while they were talking, Cinda Hall came to the door and said, "I wish you would not bother our old uncle." Cinda Hall denied making the statement.

N. A. Simpson, brother-in-law of T. S. Hall, testified that he sent a car to Morrilton for Hall and Webb when they returned to Scotland; that, when they reached Scotland, T. S. Hall offered to pay him; he inquired what luck he had on the trip, and Hall showed him some gold and other money in his pocketbook. T. S. Hall denied bringing any gold back with him from California, but testified that, if he showed Simpson any, it was what had been taken in at the store in his absence.

Clara Webb, wife of appellee, testified that, on Sunday before Jasper Webb, Sr., died, she heard him ask T. S. Hall for his money, and T. S. Hall answered: "I am keeping it, You don't need it;" that he asked for his money a second time and received the same answer;

that she went to the kitchen and told Cinda Hall what occurred in her hearing; that Cinda Hall said T. S. Hall had a part of the money and went to the room and stopped the conversation. John Hall, Cinda Hall and T. S. Hall denied the conversation, or that Clara Webb was at the Hall home that day. Judge and Mrs. Griggs both testified that she and T. S. Hall were there on the day mentioned. Mrs. Lindsey testified that Clara Webb told her of the occurrence the day Jasper Webb died.

Sallie Simpson testified that she was at the home of John and Cinda Hall the Sunday when Clara Webb was there; that Clara Webb was there, but was on the front porch next to town and remained there not more than ten minutes; that she had a talk with Jasper Webb, who said he had some money, that he had divided all except enough to do him while he lived; he said, ''T. S. Hall was going to be paid for his trouble in going after him, and the rest to my papa and mamma for keeping him; and this conversation was about a week after Jasper Webb came.

W. J. Watson testified that Jasper Webb, Sr., told him that he aimed for John Hall to have his money for taking care of him.

Cleve Webb testified that John Hall told him there would be $900 or $1,000 left by deceased after payment of expenses, and that, if each of the others would turn back the $100 received by them before Webb left California, he would be willing to divide the whole sum equally. John Hall denied making the statement.

Rice Webb, father of the appellee and nephew of Jasper Webb, Sr., testified in substance, as follows: Came to see his uncle at the home of John and Cinda Hall and spent a week with them. Was told by deceased that he had deposited with the Bank of Scotland a draft in the amount of about $1,500, and that T. S. Hall had in his possession $1,200 or $1,500 in gold belonging to him, the deceased. Deceased desired witness to take charge of and wind up the estate; wanted his property divided

equally among his heirs. Deceased asked T. S. Hall why he did not put his money in the bank. T. S. Hall replied that it was all right any way. The attitude and conduct of defendant, Cinda Hall, his sister, was resentful and unfriendly toward him. She seemed to resent his talking to his uncle, and her actions made him feel that he was not wanted at her home. No one was present while he was talking with Jasper Webb. He would not talk if any one came in while he was talking to him. Admitted that he later wrote to John Hall the letter exhibited with his deposition in which he said that the deceased had told him that he had in the bank at Scotland $1,000 and that T. S. Hall had $1,000 in gold of his.

After the death of Jasper Webb, Sr., two letters were written to inquiring relatives by T. S. Hall, one was written for his father and the other at the instance of his father with directions to sign his mother's name to it. His mother, Cinda Hall, testified that she did not know of or authorize the letter. He explained that he had not written either letter as his father intended. In further explanation he said: "Well, the way I understood the last one—I am not quite sure now, but I think he was there and had me to write it—the first one I know he was not there, and I must have wrote it sort of by guess work and signed mother's name to it after he had told me what to write." In further explanation, he said: "Papa came in one day when I was putting up the mail. I had my mind on my own business while he was telling me something like this to write to Manda Ellis—to write her that the old man was dead, and that he would not have anything left counting anything for his expenses and trouble and for his mother's and his tombstone it would leave him in the hole something like $25. So after he had gone out, or sometime during the day, I happened to have time and thought about it so I written about what I could think of. But he told me later I did not write it like he intended." The letters are as follows:

"Scotland, Ark., October 22, 1919.

"Manda Ellis, Spiro, Oklahoma.

"Dear Sis: I reply to your letter. Uncle Jasper died 14th of October. You said something about coming. If you wanted to come, why didn't you come while he was living? We paid all expenses while he was sick and burial expenses and had to pay $25 out of our own money, and would like if you all are willing to help me make this amount up. It wouldn't be much apiece. He had nothing but what he sent in, and that was what we done and give you all.            "Your sis,

"Cinda Hall."

"Scotland, Ark., Nov. 1, 1919.

"Mr. Rice Webb.

"Dear Brother: Cleve (Webb) told me you wrote him and wanted to know about Uncle Jasper's money. Never had very much; so I would write you the truth about it as I have heard so much about it first one way and then another. You know a man can hear anything now. I know all about his money, and will tell you the truth about it, as I don't want anything that don't belong to me. After paying expenses and doctor bill and burial expenses, he had one hundred and sixty-two dollars left, and I bought your mamma and him a tombstone apiece. So I thought that would be best to do with that little amount of money, as it wouldn't be much apiece. And Cleve said that would be what he would do with it if he was me, so I done so. My wife said you wanted a pair of his glasses. Write me the kind of case they was in and I will send them to you by mail. All well. It rains here every day. Write me a long letter when you have time.            "Yours,

"John Hall."

Appellant first insists that the court erred in overruling the demurrer and refusing to transfer the cause to the circuit court. We can not agree with this contention. The gist of the bill, according to its salient allegations, was to regulate and enforce a trust fund which had

been and was being diverted and misappropriated without a complete and adequate remedy at law to prevent dissipation of the fund. The allegations state a cause of action peculiarly within the powers of courts of equity to examine. 25 C. J. 116-117. It was said by this court in *Spradling* v. *Spradling*, 101 Ark. 451, that "courts of equity have inherent and exclusive jurisdiction over all kinds of trusts and trustees. They have full and complete jurisdiction of trusts independently of statute, whether the same arise by express declaration and agreement, or result by implication of law. The court therefore did not err in overruling the demurrer to the complaint."

The next contention of appellant is that the decree of the court is against the clear preponderance of the evidence. The evidence is quite voluminous; hence we have only attempted to summarize it. An extended written analysis of it could serve no useful purpose. Our conclusion, after a careful reading and analysis of the evidence, is that Jasper Webb, Sr., had about $1,800 when he left California for Arkansas; that it was his intention to pay the necessary expenses incident to his removal to Arkansas and to give John Hall the balance for taking care of him the rest of his life. This was indicated in his first two letters; also indicated after reaching Arkansas by statements made to Sallie Simpson and W. J. Watson. This intention thus expressed is the only circumstance in the record tending to corroborate the evidence of the appellants to the effect that the gift was consummated. All other statements made by Jasper Webb, Sr., to other witnesses tended to show that he changed his mind, and that the gift he intended to make was never consummated. Practically every statement and act of John, Cinda and T. S. Hall during the illness and for a time after the death of Jasper Webb, Sr., indicate that he never gave any money to appellants. We can not reconcile a *bona fide* gift with the attempt at secrecy on the part of the Halls concerning the amount received and the

disposition made of it. The two letters written to relatives by T. S. Hall, concerning the money of deceased and the disposition thereof, not only conflict with each other but both abound in untruths concerning the amount of the money the deceased had before he started to Arkansas and the disposition made of it. The impression intended to be conveyed by the letters was that the $500 sent from California and divided between the heirs absorbed all the assets of the deceased. The letters were evidently written to forestall or prevent an inquiry as to the disposition of about $1,800 which had been reserved by Jasper Webb, Sr., at the time he sent the $500 to the heirs. The explanation attempted for writing these letters simply makes a bad matter worse, for they do not explain. We can not say the chancellor's finding against the gift was contrary to a clear preponderance of the evidence.

It is practically undisputed that at least $1,000 of deceased's money was deposited to the individual account of T. S. Hall in the Scotland Bank in September, and that the account had not been reduced below $874.45 up to and including the time a check for $1,175 was given to Dr. J. K. Hatchett in payment of fifteen shares of stock. That check absorbed the balance and all of an additional deposit made on that day, except $96.41. The court did not err in declaring the balance on that day the property of the estate of the deceased, as it will be presumed that Hall checked prior to that time, against his individual funds and not against the trust funds. Nor did the court err, as contended, in declaring a lien upon the stock for the trust fund and making an order to sell the stock to satisfy the lien. To have simply impounded and delivered the stock to the administrator would have forced him to accept stock in lieu of his judgment, which might have been of less value than the judgment. The declaration of a lien and order of sale was in effect a foreclosure, cognizable in a court of equity and not within the exclusive jurisdiction of a probate court, as suggested by appellants.

The last contention of appellants is that the court erred in rendering a joint judgment against appellants. The allegations of the bill in effect charge a conspiracy against appellants to divert the trust fund, and the allegations are fully sustained by the evidence. Under the theory and proof of a conspiracy, it was proper to render a joint judgment against the appellants.

No error appearing, the judgment is affirmed.